UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CARLA CRACCHIOLO, | ) | |
| Individually and as | ) | |
| Administratrix of the Estate | ) | |
| of Giuseppe Cracchiolo, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 11-11195-DPW |
| v. | ) | |
| | ) | |
| O'HARA CORPORATION, EASTERN | ) | |
| FISHERIES, INC., and R.C.P. | ) | |
| REALTY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER
May 22, 2013

Carla Cracchiolo, individually and as administratrix of the estate of the decedent, her late husband Giuseppe Cracchiolo, filed this suit against O'Hara Corporation, Eastern Fisheries, Inc., and R.C.P. Realty, LLC, claiming negligence under the Jones Act, unseaworthiness under the General Maritime Law, and wrongful death under Mass. Gen. Laws ch. 229, § 2. O'Hara moved for summary judgment on Mrs. Cracchiolo's Jones Act and General Maritime Law claims, and Eastern Fisheries and RCP moved for summary judgment on Mrs. Cracchiolo's wrongful death claims. I denied summary judgment as to O'Hara and granted summary judgment to Eastern Fisheries and RCP, in an *ore tenus* ruling shortly before the scheduled trial date.

Mrs. Cracchiolo moved immediately thereafter for reconsideration of the grant of summary judgment as to her claims against Eastern Fisheries and RCP.  She and O'Hara then settled the claims involving them and the need for trial was obviated. Whereupon, Mrs. Cracchiolo prematurely filed a Notice of Appeal from the grant of summary judgment to Eastern Fisheries and RCP. In this Memorandum and Order, I provide a full written statement of reasons for granting summary judgment and direct entry of final judgment from which Mrs. Cracchiolo may now properly appeal.[1]

---

[1] The decision of plaintiff's counsel to file a Notice of Appeal before final judgment entered has caused a certain amount of confusion.  Plainly, there is no jurisdiction in the Court of Appeals for such an interlocutory appeal, as the Court of Appeals indicated in its October 19, 2012 Order to plaintiff to show cause why the appeal should not be dismissed for want of jurisdiction.  *Cracchiolo* v. *Eastern Fisheries, Inc.*, No. 12-2174, Order (1st Cir. Oct. 19, 2012).  Indeed, the stipulation of dismissal pursuant to the settlement between Mrs. Cracchiolo and O'Hara was not even filed in this Court until nearly three months later.  Recognizing that a prematurely noticed appeal may nevertheless be perfected automatically after final judgment is entered, *see* Fed. R. App. P. 4(a)(2), the First Circuit has not dismissed the appeal.  However, it bears noting that the plaintiff sought, and over objection of the defendants received, expedited scheduling in this court which necessitated decision making unaccompanied at the time by full written explanation of various rulings.  Having jumped the queue for scheduling of dispositive decisions in the trial court, plaintiff's counsel was entitled to no further special treatment while a fully developed memorandum of decision to support final judgment was prepared on a schedule sensitive to the demands of other litigants for consideration of their cases.

**I.**

*A.    Background*

Mr. Cracchiolo ("the decedent") was a commercial fisherman aboard the *F/V Sunlight*, a Maine fishing vessel owned and operated by O'Hara.  The *Sunlight*, through an arrangement between O'Hara and Eastern Fisheries, would tie up and offload at 6 Hassey Street in New Bedford, Massachusetts, during the winter months.  The Hassey Street property was owned by RCP and leased to Eastern Fisheries, which operated a fish processing facility on the premises.[2]

The Hassey Street facility is surrounded by a fence on three sides (north, south, and west), with the fourth (east) side being a retaining wall separating the facility from the water.  The *Sunlight* always docked alongside the east retaining wall of the facility, in a location that allowed crew members to step on and off the stern of the boat, near the rear of the fish processing facility and on the north side of the property.  The crew could then pass along the north side of the facility and through the

---

[2]  The plaintiff, Mrs. Cracchiolo, is a Massachusetts resident. O'Hara is a Maine corporation with regular business in Massachusetts.  Eastern Fisheries is a Massachusetts corporation. RCP is a Massachusetts limited liability corporation.  Original federal jurisdiction was provided in this case under admiralty and maritime law under 28 U.S.C. § 1333 against O'Hara. Following the settlement between O'Hara and Mrs. Cracchiolo, I have continued exercise of supplemental jurisdiction under 28 U.S.C. § 1367 over the claims against Eastern Fisheries and RCP in order to bring the entire case to final judgment.

facility's parking lot to the front gate located along the western border of the fence.  The front gate served as the main entrance and exit to the facility.

The fence along the southern border of the property did not extend all the way to the retaining wall, leaving an un-fenced opening in the southeastern corner of the property between the Eastern Fisheries processing facility and neighboring property just to the south.  A rough, cropped diagram of the Hassey Street facility provided by O'Hara is set forth below.



The front gate was sometimes, but not always, locked after work hours with a chain and padlock.  Peter Anthony, a manager at Eastern Fisheries, gave at least one copy of the padlock key to Paul York, coordinator and shore engineer for the *Sunlight*.

–4–

York, in turn, gave about ten copies of the key to Joseph Martin, Captain of the *Sunlight*.  Martin distributed some keys to crewmembers, and kept the spare keys in a drawer in the galley of the *Sunlight*.

## B.    *The Accident*

On January 26, 2011, the *Sunlight* docked at the Hassey Street facility and unloaded its cargo overnight and into the morning of January 27, 2011.  A water pipe on the boat was broken and required repair, so the boat was not expected to go back out to sea until January 28.  The decedent and Craig Lazaro, another crewmember, stayed on board during the repairs while the remainder of the crew left for the day on January 27, 2011.

At approximately 7:30 p.m. that day, the decedent and Lazaro walked off the boat, using the pathway from the stern of the boat, through the north side of the property and into the parking lot.  They got in the decedent's car, drove through the front gate, and went out for dinner and some drinks.  Neither brought a copy of the front-gate key.  After dinner, the men went to Temptations, a gentleman's club, where they continued to drink. At one point, the men were separated, and Lazaro called the decedent, who told Lazaro that he had left the club and driven to another bar.  Lazaro decided to return to the *Sunlight*, and hailed a cab.

When Lazaro returned to the Hassey Street facility, he discovered that the front gate was locked.  Realizing that he did not have the money for the cab or his gate key, Lazaro walked along the outside of the fence on the south side of the facility, and entered through the opening on the eastern edge of the south fence, near the retaining wall.  Instead of walking around the processing facility, Lazaro walked beside the boat along the top of the narrow retaining wall, crossed underneath the takeout platform,[3] and then entered the boat at the stern, essentially taking a shortcut around the processing facility.[4]  Lazaro got money for the cab, exited the boat from the stern, and walked the normal north-side route through the parking lot to the front gate where he paid the cab driver.  He returned by the same route to the *Sunlight* and stepped directly onto the stern of the boat from the dock.

Lazaro then called the decedent and informed him that the front gate was locked.  He told the decedent that he had entered

_____

[3]  The takeout platform is a loading dock, an elevated platform projecting out from the facility and leaving only a narrow passage between the platform and a docked vessel.  The floor of the platform is a grate, which allows water, packing ice and fish remains to fall through the takeout platform to the retaining wall and water below.

[4] Lazaro testified that, despite having worked out of the facility for two and a half years prior to the incident, he had only taken this route once before.  He did so with another co-worker, a few weeks prior to the incident, also after returning from a night out.

-6-

the facility through the opening in the fence on the south side. Lazaro warned the decedent that the route was icy.  The decedent told Lazaro not to wait up for him and to go to sleep.

Surveillance cameras showed the decedent entering the facility at approximately 12:30 a.m. on January 28, 2011, through the opening in the fence at the southeast corner.  Instead of walking around the facility to enter the boat from the conventional north-side route, the decedent walked along the retaining wall underneath the takeout platform.  The passage was so narrow that he had to turn sideways and shimmy along the wall, while holding on to the edge of the takeout platform for support. The decedent lost his footing and fell into the water, where he drowned.  At his autopsy, his blood alcohol content was measured at 0.21 and 0.18 based on two different samples.[5]

## C.   *Procedural History*

Mrs. Cracchiolo filed her complaint against O'Hara and Eastern Fisheries on July 6, 2011.  On December 8, 2011, she amended her complaint to add RCP as a defendant.  Her amended complaint charged O'Hara with negligence under the Jones Act (Count I) and unseaworthiness under the General Maritime law (Count II), and charged wrongful death under Mass. Gen. Laws ch.

---

[5] To put these measurements in context and provide some sense of the decedent's level of intoxication, I note that it is illegal in Massachusetts to operate a motor vehicle with a blood alcohol level of .08 or more.  Mass. Gen. Laws ch. 90, § 24.

229, § 2, against Eastern Fisheries (Count III) and RCP (Count IV).  Defendants moved for summary judgment.  As earlier discussed, I denied summary judgment as to the claims against O'Hara and granted summary judgment to Eastern Fisheries and RCP. Mrs. Cracchiolo and O'Hara then reached a settlement as to Counts I and II, while Mrs. Cracchiolo moved for reconsideration of the grant of summary judgment on Counts III and IV.  I now provide a full written statement of reasons for granting summary judgment, deny the motion for reconsideration and direct entry of final judgment.

## II.

A party is entitled to summary judgment when that party as "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of*

*Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

III.

**A.  *Legal Framework***

Massachusetts law provides that a person who "by his negligence causes the death of a person . . . shall be liable in damages . . . ." Mass. Gen. Laws ch. 229, § 2.  The elements of the plaintiff's wrongful death action are the same as those in a common law negligence action; namely, Mrs. Cracchiolo must show that the defendant owed the decedent a duty of care, breached that duty, and in so doing caused the decedent's death.  Although questions of breach and causation are typically the province of a jury, the existence of a duty is a question of law for the court and a proper subject of summary judgment. *Jupin* v. *Kask*, 849 N.E.2d 829, 835 (Mass. 2006).

Mrs. Cracchiolo based her claim on two theories.  First, she claimed that defendants were negligent in keeping an inconsistent practice with regard to locking the front gate and in failing to give crewmembers keys or confirm that they had keys with them when leaving the property.  The defendants' duties with respect to managing the front-gate schedule and supervising the availability of keys ostensibly derived from the foreseeability that failure to do so would cause crew members to seek a dangerous alternative route onto the boat when the gate was

locked.  Second, Mrs. Cracchiolo claimed that the pier was icy and thus posed an unreasonable risk to the crew members in the area.  The Massachusetts Supreme Judicial Court treats accumulations of snow and ice like other property hazards, *see Papadopoulos* v. *Target Corp.*, 930 N.E.2d 142 (Mass. 2010), and thus the duty to remove those hazards derived from the defendants' duty to maintain the Hassey Street property in a reasonably safe condition in light of the circumstances.

Nevertheless, both theories of liability are subject to the axiomatic limitation that a defendant only owes a duty of care to those "persons who are foreseeably endangered by his conduct, with respect to all risks that make the conduct unreasonably dangerous." *Jupin*, 849 N.E.2d at 835 (quotation and citation omitted); *Papdopoulos*, 930 N.E.2d at 154 (discussing duties to protect against the "*foreseeable* harm to others" (emphasis added).  Eastern Fisheries and RCP thus argue that they owed no duty of care to the decedent because it was not foreseeable that anyone would be traversing the retaining wall between the takeout platform and the *Sunlight* on the night of the incident.  I agree.

## B.  *Absence of Duty*

There are multiple layers of unforeseeability which relieve defendants of any duty of care.  First, it was not foreseeable that anyone would be walking on the retaining wall between the takeout platform and the boat on the night of the incident, given

the limited uses for the space identified in the record.  Second,
there was a well-established custom of accessing the boat by
passing through the northern edge of the property, and it was not
foreseeable that crew members would use an alternate route due to
lack of access to the property through the front gate.  Third, it
was not foreseeable that anyone accessing the property through
the southeastern opening in the fence would nevertheless choose
the perilous path across the retaining wall to the stern of the
boat.  Taken together, these layers of foreseeability establish
that there was no foreseeable danger against which Eastern
Fisheries or RCP had a duty to protect.

   1.  Customary Use of Area Beneath the Takeout Platform

   As an initial matter, Mrs. Cracchiolo failed to establish
that the retaining wall beneath the takeout platform was a place
where anyone would be walking on the night of the incident.
Plaintiff primarily relies on Lazaro's testimony to establish the
customary uses of the space at issue.  Lazaro indicated at his
deposition, however, that he never saw anyone walking in the
space between the boat and the takeout platform.

   That said, other parts of Lazaro's deposition are less
clear.  For example, parts of Lazaro's testimony can be read
indicate that crew members used the space between the boat and
the takeout platform to tie off lines; the same testimony,
however, also can be read to mean only that it was necessary to

move along the retaining wall from the bow of the boat to the takeout platform, rather than actually between the boat and the takeout platform.  At this stage, I must take the evidence most favorably to the plaintiff and will assume that crew members walked in the space between the takeout platform and the boat in order to tie off lines.[6]

Even so, it was not foreseeable that Mr. Cracchiolo would have been walking in the space between the boat and the takeout platform.  On the night of the incident, the *Sunlight* was already docked and tied off.  Thus, even if it had been foreseeable that crew members would be walking on the retaining wall beneath the takeout platform when the *Sunlight* arrived, it was not foreseeable that anyone would be in the space again at least until the *Sunlight* was scheduled to depart the following day.

The foregoing alone might be deemed sufficient to relieve Eastern Fisheries and RCP of liability.  But, as discussed below, additional considerations confirm that the decedent's attempted journey along the retaining wall was unforeseeable.

2.  Customary Use of the Front Gate and Availability of Keys

As to the foreseeable activity of crew members getting on and off the boat even late at night, there can be no dispute that

---

[6] There was also some indication that the netting beneath the takeout platform was used for scallop-related ventures.  But, as the record evidence establishes, the *Sunlight* was a herring vessel and there is no record evidence it would have had any need for this equipment.

the well-established custom was to enter and exit the boat from
the stern and to walk along the north side of the facility.
There is no evidence that crew members ever deviated from the
northern route onto the boat when accessing the facility through
the front gate.

Moreover, it is undisputed that O'Hara had, at some point,
been provided with at least one key to the front gate.  There is
also no evidence contradicting Captain Martin's testimony that he
received several copies of the front-gate key from Paul York and
stored spare keys on the *Sunlight*.  To the extent keys were lost
or otherwise unavailable, there is no evidence that Eastern
Fisheries or RCP were ever informed.  Captain Martin also
testified that the crew could always reach him or *Sunlight*
coordinator Paul York by telephone regarding any issue--
presumably including the unavailability of keys; Eastern
Fisheries' Peter Anthony, in turn, made himself available to
Martin and York day and night.

There is no evidence in the record indicating that Eastern
Fisheries or RCP should have been aware crew members might have
lacked keys, or might have been unable to contact someone with
keys, such that they were unable to access the property through
the front gate when it was locked.[7]  As far as could have been

---

[7] Lazaro, for his part, testified that he did not even know of an
alternative route onto the property until his only other use of
the southeastern entrance to the property, a few weeks prior to

apparent to Eastern Fisheries or RCP, myriad means of front-gate access were available; it was thus unforeseeable on this record that crew members would seek to access the property by some other route.

With a clear custom regarding the north-side route crew members traveled between the boat and the front gate and without any indication that front-gate access was unavailable, on this record it would not be foreseeable to Eastern Fisheries, RFC or any similarly situated property owner that anyone would use the southeastern opening in the fence to enter the property, let alone make the dangerous pass between the takeout platform and the boat.  Accordingly, even if Eastern Fisheries and RFC did not keep a regular schedule as to shutting and locking the front gate, they did not thereby incur some sort of duty continually to check that spare keys were available or that the *Sunlight*'s crew members had keys with them when they left the property.

   3.  <u>Use of the Southeastern Opening in Fence</u>

There is yet one additional layer of unforeseeability.  Even if it was foreseeable that crew members might have been locked out and thus might have used the southeastern "entrance" to the property, it was not foreseeable that Mr. Cracchiolo would choose

---

the incident.  Lazaro did not notify anyone, let alone anyone at Eastern Fisheries or RCP, that he had taken the alternative route.  Neither did he request a new key, or talk to anyone about problems with getting on and off the premises after hours.

to take the narrow path along the icy retaining wall beneath the takeout platform, instead of walking around the facility to arrive at the boat using the conventional northern route.  There is no evidence that Eastern Fisheries or RCP were aware that any crew members were choosing the perilous path along the retaining wall.

Moreover, the hazard posed by the route along the retaining wall was open and obvious, which also rendered its crossing--even by those entering through the southeastern opening-- unforeseeable.  *See O'Sullivan* v. *Shaw*, 726 N.E.2d 951, 955-56 (Mass. 2000).  The grated surface of the takeout platform allowed water, ice and fish remains to fall onto the retaining wall.  A person of ordinary intelligence would recognize the treacherous conditions and understand that, if he chose to continue on his course, the property owner owed him no extra duty of care to keep him from such action.  *O'Sullivan*, 726 N.E.2d at 956.

Of course, an open and obvious danger "will not always relieve a property owner of the duty to use reasonable care in making the property reasonably safe for lawful visitors." *Papadopoulos*, 930 N.E.2d at 151.  For example, the Supreme Judicial Court recognized an exception to the open and obvious hazard rule where a property owner has reason to believe that a person would "proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of

doing so would outweigh the apparent risk." *Id.* (quoting *Restatement (Second) of Torts* § 343A cmt. f).[8]   In the context of a snow hazard, this means a property owner should expect that a "hardy New England visitor would choose to risk crossing the snow or ice rather than turn back or attempt an equally or more perilous walk around it."   *Id.*

---

[8] Last week, in *Dos Santos* v. *Coleta*, 465 Mass. 148, 2013 WL 1960641 (May 15, 2013), the Supreme Judicial Court reaffirmed its holding in *Papadopoulos* that a duty to remedy an open and obvious danger may exist if defendants could have anticipated that the condition nevertheless would have caused harm.   In *Dos Santos*, defendants had set up and maintained a trampoline next to an inflatable pool in their backyard; plaintiff was injured while doing a flip into the pool from the trampoline.   Because the trial court failed to instruct the jury on the defendants' potential duty to remedy the open and obvious danger if harm was nevertheless foreseeable, the SJC remanded for a new trial.

Although the case was tried to a jury, the SJC went out of its way to emphasize that the foreseeability in question went to the existence of a duty, *Dos Santos*, 2013 WL 1960641, at *7 n.17, which as earlier discussed is appropriate for resolution by the court.   Indeed, although the SJC remanded for a new trial, Dos *Santos* can be read as effectively deciding as a matter of law that defendants had a duty to remedy.   Analogizing the case to one in which a defendant installs a diving board in the shallow end of an in-ground pool, the SJC reasoned that the defendant "would surely have reason to anticipate that persons would use the board to propel themselves into the water despite the danger."   *Id.* at *7.

The facts of *Dos Santos* provide an instructive contrast to those presented here.   While the record here shows that the defendants could not have known of anyone walking on the retaining wall beneath the takeout platform (with the possible exception of limited use for tying off lines), the defendants in *Dos Santos* were fully aware that people were jumping from the trampoline into the pool, but had done nothing to stop them.   Indeed, one defendant confirmed that he placed the trampoline next to the pool, even though he knew it was dangerous, because he thought it would be "fun."

True, in addition to Mr. Cracchiolo, Lazaro had chosen the risky route across the retaining wall earlier on the evening of the incident, despite the open and obvious danger.  Lazaro had also made the crossing once before, earlier in January, but the record does not reveal whether the retaining wall was similarly obstructed by snow and ice at that time.  Defendants, however, were not on notice of either of Lazaro's crossings prior to Mr. Cracchiolo's attempted crossing.  But, more generally, the fact that these particular hardy New England fishermen attempted the treacherous crossing on the night of the incident, both after returning from a night on the town, does not make their behavior foreseeable.  Defendants' duties cannot be determined by the unforeseeable having occurred.  As Judge Stearns has observed in another context, "[f]oreseeability in hindsight is after all an oxymoron." *Noonan* v. *Colour Library Books, Ltd.*, 947 F. Supp. 564, 571 (D. Mass. 1996).

In *Papadopoulos*, the Supreme Judicial Court anticipated that proprietors would have a duty to remedy snow hazards in parking lots, walkways and other common areas because passage through those areas would be reasonably foreseeable despite the obvious danger.  *See Papdopoulos*, 930 N.E.2d at 144, 148, 154 n.17; *cf. also Soederberg* v. *Concord Greene Condo. Ass'n*, 921 N.E.2d 1020, 1025 (Mass. 2010) ("[I]t is entirely foreseeable that people will engage snow or ice hazards *lying in well-traveled pathways*."

(emphasis added)).  But the Supreme Judicial Court showed no
inclination toward imposing a duty to remedy hazards in obscure
corners of one's property, or even in less conventional pathways,
despite an open and obvious danger.  I have already discussed at
length the limited space on the retaining wall below the takeout
platform, even when unobstructed by snow or ice hazards, and the
unsurprisingly rare use of such an unserviceable area.

Moreover, the record is clear that a crew member entering
the property from the southeastern corner was not faced with two
"equally . . . perilous" options for getting onto the *Sunlight*.
*Papadopoulos*, 930 N.E.2d at 151.  Rather, it was obvious the
route across the retaining wall was inherently dangerous while
the alternative route was safe.  Captain Martin noted at his
deposition that he had once walked through the opening in the
southeast corner of the fence and walked around the fish
processing facility to cross back along the northern edge of the
property and enter the boat from the normal position at the
stern.  Martin testified that the route around the fish
processing facility, in contrast to the route along the retaining
wall, was unobstructed and safe both on the night he took the
route and on the night of the incident.  Thus it was not
foreseeable that anyone would have chosen the path that Mr.
Cracchiolo chose in his inebriated state.

C.   *Summary*

Although it may be that "there are clear judicial days on which a court can foresee forever," *Thing* v. *La Chusa*, 771 P.2d 814, 830 (Cal. 1989), even the most far sighted property owner could not have foreseen that Mr. Cracchiolo would have tried to traverse the retaining wall on the night of the incident.  The portion of the retaining wall beneath the takeout platform was used, at most, only for a very limited purpose.  Moreover, there was a well-established custom that crew members gained access to their vessel through the northern end of the property.  One could not foresee that crew members would deviate from this usual path if they had access through the front gate, and Eastern Fisheries and RCP had no reason to believe crew members lacked such access. Even those entering the property through the southeastern opening in the fence faced the open and obvious hazard of the icy, narrow retaining wall, while a safe and unobstructed route around the facility was readily available.  Because the route chosen by Mr. Cracchiolo was unforeseeable, the defendants owed him no duty of care to take extra steps--*i.e.*, confirming that he had a key or clearing the retaining wall of snow and ice--to insure that in his impaired state he would not be harmed by his improvident choice of the unconventional and clearly perilous route along the retaining wall onto the *Sunlight*.  Summary judgment was therefore

-19-

appropriate for Eastern Fisheries and RCP on Cracchiolo's wrongful death claims.

**IV.**

For the reasons set forth more fully above, I granted the motion (Dkt. No. 39) of Eastern Fisheries and RCP for summary judgment and now DENY Cracchiolo's motion for reconsideration (Dkt. No. 118).  I now direct the clerk to enter final judgment in this action based upon the stipulation of dismissal as to the claims against O'Hara (Dkt. No. 133) and the reasons stated in this Memorandum as to the claims against Eastern Fisheries and RCP.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE